**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **ANNE FORREST,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 08-40123-FDS** |
| **THE PAUL REVERE LIFE INSURANCE COMPANY and UNUM GROUP,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This is a civil action arising out of a claim for long-term disability benefits. Plaintiff Anne Forrest contends that defendant The Paul Revere Life Insurance Company (a wholly owned subsidiary of The Paul Revere Corporation, which is a wholly owned subsidiary of Unum Group) improperly denied her request for benefits.[1] The matter arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Forrest seeks to recover benefits that she alleges were wrongfully denied as well as attorneys' fees and costs pursuant to 29 U.S.C. §§ 1132(a)(1)(B) and 1132(g).

Forrest's claim for benefits was first denied in February 1998. Her file was then marked closed in March 2000 after an unsuccessful appeal. In 2006, Forrest initiated—but did not complete—a reassessment of her claim pursuant to a settlement between Unum and various state

[1] For the sake of convenience, the Court will refer to the insurance company defendants collectively simply as "Unum" or "defendant."

insurance agencies and the Department of Labor. That request for reassessment was denied on the grounds that Forrest had not submitted the necessary documentation by the deadline of October 1, 2006.

Unum has moved for summary judgment. The central issue presented is whether the claim is time-barred.

Unum contends that the claim is barred by both the policy's contractual limitations period and the relevant statute of limitations. In response, Forrest contends that the policy's contractual limitations provision is ambiguous and inapplicable to her claim and that the action, allowing for tolling during her ineffectual reassessment attempts, was timely filed under the statute.

For the reasons stated below, defendant's motion will be granted.

## I. Background

Except where noted, the following facts are undisputed.[2] Where disputed, the facts are presented in the light most favorable to plaintiff, the non-moving party.

### A. The Initial Claim for Benefits

As of 1997, Anne Forrest was a Senior Economist at the Environmental Law Institute, with a B.A. from Yale University and a Ph.D. in economics from Duke University. She was a participant in a welfare benefit plan funded by an insurance policy issued by Unum to ELI. The Plan is governed by ERISA.

In June 1997, Forrest was in a car accident that left her with various injuries, including

---

[2] In her opposition, plaintiff "stipulates to the accuracy of the facts as alleged in the Defendants' Statement of Facts to which there is no genuine issue to be tried." (Pl. Opp. at 2). However, her response to defendant's statement of facts does, in fact, dispute several points. In addition, her affidavit in opposition to summary judgment sheds considerable light on her side of the claim reassessment process. The Court's presentation of the facts reflects the truly undisputed portions of defendant's statement of material facts, disputed facts in the light most favorable to plaintiff, and facts gleaned from plaintiff's affidavit and supporting documents.

some loss of cognitive abilities.[3]  In July 1997, she applied for long-term disability benefits.  By letter dated February 27, 1998, Unum informed her that she did not meet the requirements of "total disability," as defined in the plan, and denied her claim.  She was advised of her right under ERISA and the Plan to appeal that determination.

On May 6, 1998, Forrest appealed the decision.  On July 23, 1998, Unum informed her by letter that it would need to conduct additional testing before rendering its determination on her appeal.  In addition, the letter stated as follows:  "As we shall be unable to conduct the neuropsychological testing and conduct a full and fair review of the contents prior to [the deadline for deciding the appeal under ERISA], we shall be willing to exceptionally provide benefits until this review has been completed.  These benefits shall be made on a good faith basis, and should not be construed as a waiver of any of the rights afforded to Us under the group Policy."  (Curtis Aff. at Ex. E).  The letter stated that the benefits, retroactive to December 25, 1997, would continue to be paid "until such time that we have completed the review and rendered our final determination on the request for appeal."  (*Id.*).

On March 10, 2000, Unum informed Forrest by letter that she would be ineligible to receive long-term disability benefits beyond December 25, 1999.[4]  According to the letter, the Plan limited "Mental Disorder" benefits without hospitalization to a maximum of 24 months.  (Curtis Aff. at Ex. F).[5]  Unum reviewed Forrest's claim and medical history and concluded that

---

[3] Forrest does not raise her loss of cognitive abilities as a mitigating issue in this case—for example, she does not contend that she was unable to respond to deadlines due to her disability.

[4] It is unclear whether she was paid benefits between December 1999 and March 2000.

[5] Forrest contends that her injury was a physical injury, not a mental disorder.

she "is not precluded from performing her occupational duties as a result of a physical condition, and that all evidence supports that her Disability is due to a Psychiatric Disorder." (*Id.*). In closing, the letter stated as follows: "The administrative remedies have now been exhausted under the plan, and there will thus be no further appeals available to Ms. Forrest. We have now marked her file as closed." (*Id.*).

The Plan contains a contractual limitations period. In a section entitled "LEGAL ACTIONS AND LIMITATIONS," it provides as follows:

> No action at law or in equity may be brought to recover under this Policy unless proof of loss has been filed according to the terms of this Policy. In addition, the claimant must wait 60 days after filing proof of loss before taking action. If any action is to be taken, it must be taken within three years from the end of the 60-day time period. If any time limit in this Policy is less than the law specifies in the state where the claimant lives at the time this Policy is issued, We extend the time limit to agree with the minimum period specified by such law.

(Curtis Aff. at Ex. A). At the time the policy was issued, Forrest apparently resided in Connecticut.

**B. <u>The Claim Reassessment Process and Forrest's Initial Contacts</u>**

In November 2004, Unum and its affiliated entities entered into a Regulatory Settlement Agreement ("RSA") with various state and federal regulatory agencies concerning its long-term disability claims-handling practices. Under the RSA, Unum agreed to provide a Claim Reassessment Process for certain claimants.

According to Forrest, in December 2004 she learned from a former college classmate, Loretta Sherblom, that Unum had entered into a settlement agreement in which it agreed to review certain previously denied and terminated claims. On January 12, 2005, Sherblom contacted George Sells, a Unum employee, on Forrest's behalf to inquire whether her claim was

eligible for the reassessment program. On January 24, 2005, a different Unum employee, Kelly Dieppa, responded to Sherblom by e-mail, stating that "she is not in an eligible group" because "her claim was closed." However, Dieppa also explained that Forrest "may dispute her eligibility status (basically, just ask her to state her case and ask for a review under the Agreement) by sending in a letter specifically asking for a review of her eligibility under the Multi-State Agreement. Please have her send the letter in to the following address—and be sure to indicate in the subject line: Multi-State Agreement Eligibility." She then provided an address. Sherblom forwarded the e-mail to Forrest, who said she would work on it but that it may take her "[a while] to get it together." (Forrest Aff. ¶¶ 3, 4, Ex. B).

It does not appear that Forrest ever disputed her eligibility in the manner suggested by Dieppa. Instead, Forrest contacted her former employer, ELI, about the reassessment process. (Forrest Aff. ¶ 5). The information Forrest received from this effort came through a string of intermediaries. Evidently, Forrest spoke to an ELI employee, who referred her to ELI's director of administration (Laura Van Wyk), who in turn contacted ELI's outside benefits consultant (Candice Wilson), who contacted Unum. Wilson related the substance of her conversation with Unum to Van Wyk, who forwarded the entire e-mail chain to Forrest. In this manner, Forrest was again told in July 2005 that, according to Unum, the maximum benefits on her claim had been paid out and that she had exhausted her long-term disability benefits. Wilson also told Van Wyk, however, that a letter had been sent out to all Unum long-term disability claimants offering to reassess claims denials, and gave a toll-free number that Forrest could call if she felt that Unum had missed something. (Forrest Aff. ¶ 5, Ex. C).

By that point, Forrest had apparently retained counsel. Thus, as reported by Van Wyk,

Wilson advised Forrest that "it would be best for you and/or your attorney to work directly with UNUM." Wilson also provided Van Wyk with toll-free phone numbers for Unum's long-term disability claims office and the reassessment line, advising that if Forrest had indeed already hired a lawyer it was likely that the reassessment unit would only speak with her attorney. Finally, Van Wyk reported to Forrest that "at this point the most help ELI can offer is to provide you with contact information for UNUM (let me know if you need information beyond the numbers given above), but beyond that it is best for you to work directly with the carrier. That way you will get the most accurate information in the most direct way." (Forrest Aff. at Ex. C).

Beginning in January 2006, Forrest also sought the assistance of the United States Department of Labor. Forrest ultimately reached a woman named Mary Rosen at the DOL. On May 12, 2006, Forrest e-mailed Rosen, reviewing the facts of her case. On May 18, 2006, Rosen contacted Unum on behalf of Forrest.

On May 19, 2006, Rosen called Forrest and told her that she had spoken to someone at Unum and that Unum had "agreed to reassess her case."

**C. <u>The May 19, 2006 Letter</u>**

On May 19, 2006, Unum sent Forrest a letter that stated the following:

> We are writing to let you know that we received your election to participate in the Claim Reassessment Process for the disability claim referenced above.
>
> We will reassess claims of those electing to participate based on the original dates of when the claim was denied or closed with the oldest closure dates being reviewed first. This process may take up to 24 months or more. We will send you a letter closer to the time when your claim will be reassessed, indicating the approximate time period of your reassessment and request that you complete and return a Reassessment Information Form within 60 days to provide information needed for the reassessment of your claim.

> If you have any questions regarding the Claim Reassessment Process, please contact us toll-free at 1-877-477-0964.

(Curtis Aff. Ex. I).

**D. <u>The June 1, 2006 Letter and Attachment</u>**

The company contacted Forrest by letter again on June 1, 2006. The letter began as follows:

> You previously elected to participate in our Claim Reassessment Process with respect to the captioned claim. As we previously indicated, we are proceeding with the reassessment of claims based on their original dates of denial or closure. We are now ready to begin the reassessment of your claim . . . .

(Curtis Aff. Ex. J). The letter set out a detailed schedule for the reassessment process:

> You will need to complete and return your Reassessment Information Form within 60 days of the date of this letter . . . . We will send you an acknowledgment notifying you that we have received your completed Reassessment Information Form within 30 days of its receipt. If you need additional time to complete the Reassessment Information Form, please provide your reasons for needing an extension of time in writing to us within 60 days of the date of this letter.

(*Id.*). The letter also noted that successful claimants would give up certain rights to sue the company:

> Prior to reassessment of your claim, you must sign the Reassessment Information Form in each of the indicated places. This will confirm your agreement that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, that you will not pursue legal action against the Company to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed. . . . In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate . . . litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived.

(*Id.*). The letter also warned as follows:

> *If we do not receive your completed Reassessment Information Form or request*

> *for an extension within the timeframe noted above, we will assume that you no longer wish to participate in the Claim Reassessment Process and your claim will remain closed.*"

(*Id.*) (emphasis added).

Finally, although the May 19 confirmation letter had warned that the process could take more than two years from start to finish, the June 1 letter stated as follows: "Once we have received your Reassessment Information Form and any other information we need to review, the reassessment of your claim could take from 4 to 12 weeks, depending on the complexity of your particular situation."

Attached to the letter was a Reassessment Information Form. The instructions on the first page of the form contain the following italicized note: "*You must sign and date each of the following sections of the form in order for us to begin the Claim Reassessment Process.*" The sections referred to were the Certification, the Conditional Waiver and Release, and the Authorization. (*Id.*). The Conditional Waiver and Release included the following language:

> By choosing to participate in the Claim Reassessment Process, I hereby agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, I will not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If I receive any additional benefits as a result of this reassessment, I hereby waive and release any right to sue [Unum] for their prior failure to pay those same benefits to me. . . . To the extent that following the reassessment there remains a complete or partial denial of benefits, my right to initiate . . . litigation regarding that portion of the prior denial that has not been reversed or changed is not waived. In addition, any applicable statute of limitations is tolled during the pendency of the reassessment of my claim; however, I understand that my participation in the Claim Reassessment Process will not revive or reinitiate the statute of limitations with respect to the previous claim decision.

(*Id.*).

**E. The Hiring and Termination of Original Counsel**

By June 2006, Forrest had retained the services of an attorney, Mark Bronstein, to represent her concerning her claim for benefits. By letter to Unum dated July 17, 2006, Bronstein requested an extension of time in which to submit the required information for the reassessment process.[6] Forrest was aware that Bronstein asked for an extension, but contends that he also told her that the reassessment process "could take a very long time and we may not learn anything about the claim for over a year."[7]

By letter to Bronstein dated July 21, 2006, Unum agreed to provide Forrest with additional time. The letter stated that "your response will be due no later than October 1, 2006." (Curtis Aff. at Ex. L).

Bronstein did not file the necessary form by October 1, 2006. Indeed, he never submitted any reassessment form, or any other documentation, on behalf of Forrest.

Forrest appears to have been in regular contact with Bronstein throughout the fall and winter of 2006-2007. In mid-October 2006, Forrest e-mailed him twice about locating and selecting an expert who could render an opinion on her brain injury in support of her claim. On November 30, she e-mailed him again, this time to notify him that she had been awarded benefits by the Social Security Administration.

Toward the end of March 2007, however, the lines of communication between client and counsel appear to have broken down completely. Forrest reports that between March 21, 2007,

---

[6] Although Bronstein's letter refers to a "signed authorization" that he has enclosed, the attachment was not provided to the Court. It is not clear whether the authorization refers to his representation of Forrest or the authorization that Forrest would have needed to sign and date to complete the Reassessment Information Form.

[7] It is not clear from plaintiff's affidavit when this conversation with Bronstein took place.

and June 28, 2007, she called Bronstein seven times and left messages, but never heard back from him. She followed the phone calls with a letter dated June 29, 2007, inquiring about the status of her case and Bronstein's status as her attorney. Forrest asserts that although she was unsure of the status of her case, the passage of time itself was not unexpected in light of the anticipated timeline for reassessment. (Forrest Aff. ¶ 23).

After sending the letter, Forrest resumed attempts to reach Bronstein by telephone. At some point, a friend of Forrest's named Kathy Rabin sent an e-mail to Bronstein that included the following:

> I would love to continue to recommend you [as the go-to-guy for disability legal issues] but I am very concerned that you have not communicated with Anne Forrest despite her numerous attempts to reach you over the last four months. She is coming to visit the week of August 13th. Is there a possibility that we could meet with you some time that week? Our hope is that you will have some ideas about obtaining [an] expert opinion about her condition and how to proceed forward with her case. If for some reason, you are not able to continue to represent her, she would want to collect her file (I hope that it doesn't come to this) so that she could seek other counsel.

Finally, on July 19, 2007, Bronstein responded to Rabin by e-mail: "I am sorry that personal and office organization issues have not allowed me to keep Anne's case moving. Not to minimize the problem, but I do not think there is any harm done other than the unnecessary delay I have cause[d] for which I am very sorry. I suggest that we plan a meeting for the week of August 13 and then Anne can decide what would make the most sense for her in terms of the future." (Forrest Aff. at Ex. M).

It does not appear that the mid-August meeting ever took place. Forrest continued to be unable to communicate with Bronstein or even to prompt a return call, despite repeated attempts starting in late August and continuing through October 2007.

On October 9, 2007, Forrest asked Bronstein to transfer her file to new counsel.

**F. The Retention of New Counsel and the Final Denial**

On November 1, 2007, Forrest met with new counsel, Elliot Andalman. Andalman apparently contacted Unum promptly thereafter. On November 20, 2007, Andalman received a letter from Unum stating that Forrest's reassessment paperwork had not been received by the October 1, 2006 extended deadline, and that therefore "no further action can be taken on your client's claim." (Forrest Aff. at Ex. P).

Forrest states that she did not know that her claim was not being reviewed until she received a copy of the November 20 letter. Until then, she had assumed that Unum was reviewing her case the entire time. (Forrest Aff. ¶¶ 34, 35).

**G. Procedural History**

Forrest commenced this action on June 30, 2008. The Environmental Law Institute Long-Term Disability Plan, initially named as a defendant, was dismissed pursuant to a stipulation dated October 15, 2008. Unum has now moved for summary judgment in its favor.

## II. Standard of Review

"In an ERISA benefit denial case . . . the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy v. Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir. 2002). That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

As this dispute focuses exclusively on the question of whether plaintiff's action is time-barred, the present summary judgment motion does not present an administrative determination or denial of benefits for the Court to evaluate. Accordingly, the normal summary judgment standard will apply.[8]

## III. Analysis

Unum contends that the claim is time-barred under both the contractual limitations period and the applicable statute of limitations.

### A. The Contractual Limitations Period

As noted, the Plan itself contains a limitations provision, which bars all suits not filed within three years and sixty days after a claimant files her "proof of loss." (Pl. Opp. at 2-3). Plaintiff contends that the contractual limitations provision is inapplicable to her situation (or, at most, ambiguous) because it is tied to the filing of a "proof of loss." It is undisputed that plaintiff filed her proof of loss in 1997, when she began receiving benefits under the policy. Forrest thus contends that the contractual provision makes no sense when, as in her case, the benefits claimed were actually paid and then terminated on a timely filed claim.

Similar language was considered under analogous circumstances by Judge Ponsor of this District in *Skipper v. Claims Services Int'l*, 213 F. Supp. 2d 4, 6-8 (D. Mass. 2002). Judge Ponsor concluded that where the proof of loss had been accepted by the insurer and benefits paid for more than six years, the limitations language "offers nothing intelligible" that could fairly be

[8] Under Fed. R. Civ. P. 56(c), summary judgment is appropriate where the record, construed in the light most favorable to the nonmovants, discloses no genuine issue of material fact and demonstrates that the moving party is entitled to judgment as a matter of law. *Fidelity & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 6 (1st Cir. 2008) (internal quotations and citations omitted).

said to limit the right of the insured to dispute the termination. This Court agrees with the analysis of that case, and concludes that, at a minimum, summary judgment on the basis of the contractual limitation is not appropriate where the insurer paid benefits for two years after the filing of a proof of loss and subsequently terminated those benefits.[9]

Accordingly, the contractual limitations provision does not bar plaintiff's claim. The statute of limitations, however, presents more difficult issues for plaintiff.

### B. <u>The Statute of Limitations Period</u>

ERISA contains no statute of limitations. Accordingly, federal courts are required to borrow the relevant statute of limitations from the forum state. *Island View*, 548 F.3d at 27. "Typically, a claim for benefits under an ERISA health plan would be treated by analogy to a contract claim, the benefits contract being the substantive source of the obligation." *Id.* Massachusetts law provides a six-year limitations period for contract actions. Mass. Gen. Laws ch. 260, § 2; *see also Salcedo v. John Hancock Mut. Life Ins. Co.*, 38 F. Supp. 2d 37, 40 (D. Mass. 1998) ("[I]t is appropriate to borrow the six-year statute of limitations from M.G.L. ch. 260, § 2 for claims to recover benefits under ERISA.").

Although the case law is not entirely uniform on this point, the parties agree—and the Court is persuaded—that an ERISA cause of action for wrongful denial of benefits accrues when plaintiff's internal appeal is denied. *See Salcedo*, 38 F. Supp. 2d at 42-45 (discussing accrual of

---

[9] The Plan also states that "[i]f any time limit in this Policy is less than the law specifies in the state where the claimant lives at the time this Policy is issued, we extend the time limit to agree with the minimum period specified by such law." As noted, plaintiff appears to have been a resident of Connecticut at the relevant time. That provision contemplates the existence of a state statute requiring insurers to provide a minimum amount of time in which to permit claimants to file suit. *See, e.g.,* Mass. Gen. Laws ch. 176A, § 8(c); *see also Island View Residential Treatment Ctr. v. Blue Cross Blue Shield of Mass., Inc.*, 548 F.3d 24, 27 (1st Cir. 2008). If Connecticut has a relevant provision, counsel have not brought it to the Court's attention.

causes of action for benefits under ERISA). This means that Forrest's claim accrued on March 10, 2000, the date on which Unum denied her appeal and closed her file.[10]

Plaintiff accordingly had six years, or until March 10, 2006, in which to file her complaint. As the complaint was not filed until June 30, 2008, the claim is time-barred unless (1) the limitations period was tolled by agreement, or (2) Unum is equitably estopped from asserting the statute of limitations defense.

**1. Tolling by Contract**

Plaintiff contends that under the terms of the RSA, "Unum agreed that any applicable statute of limitations is tolled during the pendency of the reassessment." (Pl. Opp. at 10). She further contends that she "elected to participate" in the process on January 19, 2005, and that the limitations period should be tolled until November 20, 2007, when she "first became aware that the Reassessment process had been concluded." (*Id.*).

The RSA contains a provision concerning the tolling of any limitations period, the relevant text of which is set out in the margin.[11] In substance, the RSA (1) permitted Unum to require that

---

[10] Plaintiff does not contend that the accrual should be delayed on grounds of fraudulent concealment, or that for some other reason she did not know (or reasonably could not have known) that her claim had accrued.

[11]

> Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. . . . That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to

a claimant who submitted a claim for reassessment give up his or her right to sue as to the prior denial or termination if the claimant prevailed, but (2) required that if Unum did so, the statute of limitations would be tolled during the reassessment process. The June 1, 2006 letter sent by Unum, and the attached Reassessment Information Form, essentially tracked the RSA; the Form that Unum asked plaintiff to sign required her to agree to give up her right to sue (to the extent she was successful) and provided that the limitations period would be tolled during the review process.

Those documents did not, however, toll the limitations period here for at least two reasons. First, the limitations period had already expired on March 10, 2006, nearly three months before plaintiff even received the June 1 letter and attachment. Because the period had already expired, there was no remaining time period to toll. Second, plaintiff never signed the Reassessment Information Form. Unum cannot be bound by a limitation provision in a contract where no contract was ever formed. Accordingly, plaintiff's claim of tolling by contract must be rejected.[12]

**2. Equitable Estoppel**

Plaintiff also contends that in January 2005, a Unum employee "informed [her] that her

---

> initiate . . . litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived.

(RSA at 13-14).

[12] It is undisputed that Unum permitted plaintiff to make an "election to participate in the Claim Reassessment Process" on May 19, 2006, nine days after the expiration of the six-year limitations period. By doing so, Unum might be deemed to have implicitly waived the right to assert a statute of limitations defense as to that claim. The Conditional Waiver and Release form sent to Forrest, however, required an acknowledgment that her "participation in the Claim Reassessment Process will not revive or reinitiate the statute of limitations with respect to the previous claim decision." (Curtis Aff. Ex. J). Plaintiff, in any event, never participated in the process (or, more accurately, made an initial election to participate, but abandoned it soon thereafter).

claim was not eligible for reassessment." (Pl. Opp. at 11). She contends that she was in fact eligible, and "but for Unum's error, [she] would have become a participant in the Reassessment in January, 2005. Unum should not benefit from its own mistake." (*Id.*). In substance, plaintiff seeks to prevent Unum from asserting the running of the limitations period between January 19, 2005—the date on which she first inquired about participating, and was told that she was ineligible to participate—and November 20, 2007—when she first learned that the company declined to permit her to participate in the reassessment process.

Plaintiff appears to suggest that the Court should equitably estop Unum from asserting a statute of limitations defense.[13] "Even when a federal court borrows a state's statute of limitations, the court applies federal equitable estoppel principles." *Benitez-Pons v. Puerto Rico*, 136 F.3d 54, 63 (1st Cir. 1998). Under federal law, "a party seeking to assert equitable estoppel must demonstrate that (1) the party to be estopped made a definite misrepresentation of fact to another person having reason to believe that the other would rely upon it; (2) the party seeking estoppel relied on the misrepresentations to its detriment; and (3) the reliance was reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Ramirez-Carlo v. United States*, 496 F.3d 41, 49 (1st Cir. 2007)

---

[13] "The taxonomy of tolling, in the context of avoiding a statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel. . . . [T]he reported decisions of the federal and state courts do not always mean the same thing by their use of these phrases, and phrases to which some judges ascribe different meanings are used interchangeably by other judges." *Pearl v. City of Long Beach*, 296 F.3d 76, 81 (2d Cir. 2002). In the First Circuit, at least, plaintiff's contention, for which she cites no authority, most closely approximates an argument for equitable estoppel, not equitable tolling. "The two doctrines are closely related, but distinct. Equitable tolling applies when the plaintiff is unaware of the facts underlying his cause of action, while equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's conduct or statements in failing to bring suit." *Ramirez-Carlo v. United States*, 496 F.3d 41, 48 (1st Cir. 2007) (internal citations omitted). However, as equitable considerations dominate the analysis under either doctrine, the choice makes little difference here where the balance of the equities does not tip in plaintiff's favor. *Cf. Abraham v. Woods Hole Oceanographic Inst.*, 553 F.3d 114, 119 (1st Cir. 2009) ("[E]quitable tolling is sparsely applied and cannot be used to rescue a plaintiff from his or her lack of diligence.").

(quoting *Heckler v. Community Health Servs.*, 467 U.S. 51, 59 (1984)) (internal quotation and original textual alteration omitted); *see also Nagle v. Acton-Boxborough Reg'l Sch. Dist.*, No. 08-2374, slip op. at 5-6 (1st Cir. July 30, 2009). "If, at the time when he acted, such party had knowledge of the truth, or with reasonable diligence he could acquire the knowledge[,] he cannot claim to have been misled by relying upon the misrepresentation or concealment." *Benitez-Pons*, 136 F.3d at 63 (internal quotation, original textual alteration and citations omitted).

The alleged misrepresentation of fact was contained in the e-mail sent by Kelly Dieppa to Loretta Sherblom on January 24, 2005, stating that Forrest was "not in an eligible group" because "her claim was closed." The Court has serious doubts as to whether, in context, this was a definite misrepresentation of fact. Nonetheless, it will assume for present purposes that the statement so qualifies. It will also assume that Sherblom was, for these purposes, plaintiff's agent. There is, however, no evidence that plaintiff relied on that misrepresentation to her detriment, or that the reliance was reasonable.

In the very same e-mail in which Dieppa made the alleged misrepresentation that her claim was ineligible, she advised plaintiff—accurately—how to dispute that determination. Sherblom forwarded the e-mail to plaintiff the same day, and recommended that she go through the process of trying to have her claim reassessed and offered to assist her. Plaintiff responded three days later with an e-mail stating, "I will work on it . . . . I will take you up on it on the opportunity to pass it by you. It may take me [a while] to get . . . it together, but I am glad you saw the opportunity." (Forrest Aff. Ex. B).

In other words, plaintiff did *not* fail to act because Dieppa misinformed her that she was not eligible. She knew immediately—because Dieppa told her— that she could dispute that

determination, and indicated to her friends that she intended to do so.

The problem, of course, is not that plaintiff reasonably relied on a false statement by Dieppa to her detriment. She did not. The problem is that she hired Bronstein to pursue her claim, and he neglected it and missed the deadline for submission. Harsh as it may sometimes seem, clients are bound by the actions—or, in this case, the inaction—of their attorneys when they act in their representative capacities. Having chosen an attorney to represent her, a client cannot subsequently "avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." *Link v. Wabash R. Co.*, 370 U.S. 626, 634 (1962) (internal quotation and citation omitted); *see also Farm Constr. Servs., Inc. v. Fudge*, 831 F.2d 18, 21 (1st Cir. 1987) ("[The First Circuit] has turned a 'deaf ear' to the plea that 'the sins of the attorney should not be visited upon the client.'") (citing *Link*; quoting *Damiani v. Rhode Island Hosp.*, 704 F.2d 12, 17 (1st Cir. 1983)); *Jorstad v. Connecticut Gen. Life Ins. Co.*, 844 F. Supp. 46, 57 (D. Mass. 1994) (rejecting ERISA plaintiff's "equitable" argument that the administrative record should be reopened where she relied on her attorney to properly present her claim and that attorney failed to submit additional supporting evidence); *Rolec, Inc. v. Zevetchin,* 155 F.R.D. 5, 8 (D. Me. 1994) ("[T]here are few tenets so well established in American jurisprudence as the proposition that a client is bound by the acts or omissions of his counsel.").

This Court takes no position as to whether plaintiff has a valid claim of legal malpractice against Bronstein. She does not, however, have a valid claim against Unum, as her claim is barred by the six-year statute of limitations for contract claims under Massachusetts law.

## IV. Conclusion

For all of the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: July 31, 2009